# EXHIBIT B

## MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (the "Agreement"), dated this _9/8_ day of September, 2014, between BMO Harris Bank N.A. ("Bank") and R.A. Yancey & Associates, Inc., a Florida corporation (the "Manager").

## RECITALS

Bank holds first priority liens and security interests in certain personal property and other assets of certain entities known to the parties as Truland ("Borrower"; the entities comprising Borrower are set forth in Exhibit A) and hereinafter referred to as the "Property" (a description of the Property is set forth in Exhibit B); and

Bank has or will soon file a complaint and make application on behalf of Bank with the United States District Court for the Eastern District of Virginia, Alexandria Division the appointment of the President of Manager as receiver (the "Receiver") to assemble, assess, manage, operate and liquidate the Property and collect the revenues arising therefrom and disburse the expenditures relating thereto (such proceeding being referred to herein as the "Receivership"); and

Bank desires Manager's assistance in the management and disposition of the Property, and Manager desires to provide such assistance, all as more particularly set forth below.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bank, as agent of and on behalf of Bank, and Manager, agree as follows:

## ARTICLE I
## APPOINTMENT AND AUTHORITY

1.01 Appointment. Bank hereby engages Manager, and Manager hereby agrees to make itself available on a non-exclusive, independent basis, to render to Bank management, supervisory and other services or activities described on Exhibit C hereto with respect to the Property.

1.02 Authority of Manager. Bank hereby authorizes Manager to take any and all action necessary or convenient to perform Manager's duties under this Agreement, except as specifically limited herein. Bank and Manager acknowledge and agree that Manager's engagement hereunder is in all events subject and subordinate to the terms and provisions of the Order appointing Receiver and such other orders of the Court as may be entered from time to time, the terms and provisions of which are all incorporated herein by this reference; and that in the event of any

conflict between any provision of this Agreement and such Order or court orders, the latter shall control.

1.03 Actions by Bank. Jack Kane, Jaclyn Ausborn and Sajida Ali, each an employee and officer of Bank (each, a "Designee"), shall be deemed to be the sole representatives of Bank, authorized to act for Bank for purposes of all actions, approvals, and consents by Bank with respect to this Agreement. Manager may rely upon any such action, approval or consent from any Designee, and such shall conclusively be deemed to bind Bank. If Bank desires to designate different or additional representatives to act as Designees for Bank under this Agreement, Bank shall notify Manager of such new representatives no later than three days prior to such designation becoming effective, except in case of exigent circumstances. Manager, in performing the services called for herein, shall act as an independent contractor of Bank and shall not be, or be deemed to be, an employee of Bank for any purpose including, without limitation, determination or payment of compensation or benefits of any kind, terms or conditions of employment, liability for any form of contribution or payroll taxes, compliance with statutes governing employment practices, or matters involving workmen's compensation insurance. Nothing set forth herein shall be construed so as to constitute the relationship between Bank and Manager as a partnership or joint venture, to convey to Manager any interest in the Property, to constitute the parties or their respective partners, officers, or employees as partners, officers or employees of the other, or to authorize either party to act for or bind the other in any manner whatever, except as specified herein.

## ARTICLE II
## DUTIES

Subject to the limitations set forth herein, Manager shall use reasonable diligence in managing, supervising and undertaking the activities described in Section 1.01 and shall take such actions as it may deem reasonably necessary to accomplish the Bank's objectives and protect the Bank's interest with respect to the activities listed in Section 1.01. By way of illustration and not limitation, Manager shall do and shall be authorized and empowered to do, or to cause others to do, the following:

2.01 Operating Budgets. From time to time as may be requested by Bank, Manager will assist in and undertake in the preparation of operating budgets for the activities described in Section 1.01, which shall be submitted to Bank for consent (the "Operating Budgets"). Upon consent by Bank of such Operating Budget(s) or Extraordinary Expenditures (as hereinafter defined), Manager shall be deemed authorized to incur, and, to the extent funds are available to Manager (from Property revenues collected by Manager) to pay, such expenditures. Manager shall not be financially responsible for any expenditure made under an approved Operating Budget or as an Extraordinary Expenditure, whether incurred by Manager as the independent contractor of Bank hereunder or otherwise, and Bank shall be solely responsible to pay for such expenses. Other than expenditures necessitated by an emergency, any expenditures not specifically set forth in an approved Operating Budget must be submitted to the Bank for consent

prior to it being incurred or paid (the "Extraordinary Expenditures"). Subject to any orders entered by the Court, Receiver agrees to promptly remit any cash in Receiver's possession in excess of $500,000 to Bank for application to the obligations owed by Borrower to Bank, unless otherwise agreed by the Bank or to the extent subject to liens or trust fund claims asserted by third parties.

    2.02  <u>Reports/Communications.</u>

        A.    Manager shall keep at its principal office detailed records covering the performance of Manager's duties hereunder. Bank and its representatives shall have access to such books and records and the right, upon reasonable notice and at Bank's expense, to examine and copy them at any time during normal business hours.

        B.    On or before the 15th day of each month, Manager shall cause to be prepared and delivered to Bank a detailed status report concerning significant activities with respect to the Property, including information and recommendations concerning management and liquidation activities as described below, estimated costs to complete any Construction Contracts (defined below), revenues generated by the Property, expenses paid by the Manager related to or arising from the Property and a comparison of the foregoing (as applicable) against the Operating Budget(s).

        C.    Manager and Bank shall have regularly scheduled weekly conference calls to discuss the ongoing activities of Manager on Bank's behalf. Such calls shall be held on Mondays at 10:00 a.m., Eastern Time.

    2.03  <u>Governmental Forms.</u> Manager will execute on behalf of Bank all forms and reports to governmental agencies (except income tax returns) required with respect to the activities set forth in Section 1.01.

    2.04  <u>Marketing and Management Company Activities.</u>  Manager is authorized to act on behalf of Bank with respect to the activities of any marketing agent retained by Manager in connection with sale or auction of the Property, or any part thereof ("the Marketing Agent") pursuant to any written agreement between Manager and the Marketing Agent (the "Marketing Agreement"). In connection therewith, Manager shall monitor, manage and coordinate the activities of the Marketing Agent under the Marketing Agreement and shall make monthly reports to Bank concerning such activities as provided in Section 2.02 hereof. Manager also shall make recommendations to Bank with respect to the realization of maximum sales proceeds from the Property. All Marketing Agreements to be executed by Manager are subject to prior consent by Bank.

    2.05  <u>Sale(s) of Property.</u> Manager hereby is authorized to execute all documents including sales contracts and other instruments necessary, and to take such other appropriate actions as may

be necessary to effectuate a sale of all or any part of the Property to a third party purchaser upon prior consent of Bank.

2.06 <u>Construction Activities.</u> In connection with any ongoing construction to be performed to complete projects under which Borrower is a contractor or sub-contractor, Manager is authorized to execute appropriate agreements related to the completion of such construction as the Manager may reasonably determine are necessary or appropriate (each, a "Construction Contract"). All such Construction Contracts shall be subject to prior consent of Bank. In connection therewith, Manager shall monitor the construction activities under such Construction Contracts and shall make monthly reports to Bank concerning such activities as provided in Section 2.02 hereof. Manager also shall approve all disbursements required to be made under the Construction Contracts, in accordance with such Construction Contracts, prior to their payment.

2.07 <u>Legal Matters.</u> To the extent permitted by law and with the consent of Bank, Manager shall institute, settle or compromise any legal action and make use of such methods of legal process with respect to the Property, in the opinion of Manager, as is necessary or appropriate to protect Bank's interest in the Property. In such regard, Manager shall be empowered to employ attorneys to represent the Receiver with respect to such matters for fees and costs not in excess of those prescribed in the approved Operating Budgets or otherwise approved by Bank. Manager will advise Bank promptly by telephone, with confirmation in writing, of the receipt by Manager of any summons, subpoena, notice, letter or other communications setting out or claiming any damages, actions or liabilities against the Property or the operation thereof. Manager shall monitor all litigation matters involving the Property and shall make monthly reports to Bank concerning such activities as provided in Section 2.02 hereof.

2.08 <u>Taxes and Other Payments.</u> Manager will forward to Bank all requests for payments of property taxes, special assessments, other assessments, and insurance premiums. The foregoing undertaking is solely for the benefit of the Bank and under no circumstances shall Manager be liable to any third party for payment of any of such request for payment which Manager may undertake to forward to Bank pursuant to this Agreement, nor shall any third party have, by virtue of this Agreement or otherwise, any rights against Manager with respect to any such payments. In connection with the payment of such taxes or assessments, Manager will review any proposed assessments or bills and assist Bank, at its expense, in challenging any such assessments if requested by Bank.

2.09 <u>Contract Services.</u> Manager shall have the sole right to contract with independent contractors to provide all or any part of the services needed in connection with the activities described in Section 1.01, provided that, other than the independent contractors identified in Exhibit D hereto, any such independent contractors retained by Manager will be subject to the prior consent of Bank (such consent not to be unreasonably withheld).

2.10 <u>Administrative Services.</u> Manager will prepare and send correspondence in relation to the operation of the Property, including, without limitation, the reports referred to in Section 2.02, as may be reasonably required from time to time, or requested by the Bank.

## ARTICLE III
## TERM AND TERMINATION

3.01 <u>Term.</u> The term of this Agreement will commence as of August 14, 2014, and continue until the entry of a final, non-appealable decree terminating the Receivership after the sale or other disposition of all or substantially all of the Property, unless sooner terminated as hereinafter provided.

3.02 <u>Termination Upon Default.</u>

A.     The happening of any of the following events shall be deemed an event of default as to either party:

(i)     The failure by such party to perform any of its obligations under this Agreement and to remedy such failure within 15 days after written notice of such failure from the other party; or

(ii)     The dissolution or liquidation of such party (other than dissolution of Bank where the business of Bank is continued by a successor entity with an acceptable credit rating which agrees to be bound by this Agreement).

B.     Upon the occurrence of any such event of default, the non-defaulting party may elect, by giving written notice to the defaulting party, to terminate this Agreement. This Agreement shall also be deemed terminated effective upon the termination of the Receivership or removal of Receiver as receiver thereunder, as the case may be. Upon such termination, Manager shall continue to receive the reimbursement specified in Article IV attributable to the periods prior to the date of termination. All of the remedies granted to the non-defaulting party herein or otherwise shall be deemed to be cumulative and the exercise of any remedy shall not be considered as an election by the non-defaulting party of a remedy, or as a waiver of any other remedy specified herein or otherwise available to such non-defaulting party, except as expressly provided herein. Moreover, except as so provided, the recitation of remedies herein shall not be deemed to exclude the non-defaulting party from any other legal or equitable remedies which it may have. Failure on the part of the non-defaulting party to enforce any of the rights herein granted to it on default for any period or periods shall not operate as an estoppel or as a waiver against the non-defaulting party, or prevent the non-defaulting party at any subsequent time from electing to exercise all or any of such rights for any subsequent default, except as expressly provided herein.

3.03 <u>Termination Upon Damage, Destruction, or Taking.</u>

(Intentionally deleted).

3.04  Termination Upon Notice. After the initial 60 days after the effective date of this Agreement, upon 15 days written notice to the other party, either party may terminate this Agreement. This Agreement shall be deemed terminated effective upon the termination of the Receivership or removal of Receiver as receiver thereunder, as the case may be.

3.05  Duties Upon Termination.

A.    Upon termination of this Agreement for any reason whatsoever. Manager shall deliver to Bank, or to any person or agent of Bank pursuant to Bank's direction, all records maintained pursuant to Section 2.02 and all other contract, agreements and documents relating to the management and operation of the Property. Manager, at its own expense, may make and retain copies of any such records and documents.

B.    In the event of termination of this Agreement for any reason whatsoever, Bank shall promptly fulfill its other obligations under this Agreement, including those set forth in Article IV and Bank shall be responsible for all expenses theretofore incurred with respect to the Property under this Agreement pursuant to Operating Budgets or Extraordinary Expenses consented to by Bank. As a condition of any termination hereunder, Bank shall thereafter be responsible for, and Bank, or such other financially responsible party acceptable to Manger in its discretion, by appropriate instrument shall have taken assignment of and assumed, all obligations, commitments, and other liabilities that Manager shall have theretofore incurred or made on behalf of Bank pursuant to this Agreement or the termination hereof (including but not limited to cancellation charges and claims) and which have not been theretofore paid or fully released; provided, however, that this provision is not intended to make Bank liable to Manager or any third party for any amount, obligation, commitment or liability the undertaking of which was beyond Manager's authority under this Agreement.

## ARTICLE IV
## BANK'S RESPONSIBILITIES

4.01  Professional Fees. Bank shall reimburse Manager for the time spent by Manager's associates and the independent contractors retained by Manager working directly for Manager on activities pursuant to this Agreement. Specifically, Bank shall reimburse Manager at the rates set forth in Exhibit D for time spent by Manager's associates and independent contractors retained by Manager in rendering services to Bank under this Agreement from the date hereof. Manager periodically changes its rates from time to time. Manager will give Bank advance written notice no later than 60 days prior to any change in rates. The independent contractors retained as of the date hereof and the title/hourly rates for such independent contractors are set forth on Exhibit D.

4.02 <u>Other Expenses.</u> Bank assumes and shall pay all other direct expenses incurred on its behalf under this Agreement, and shall promptly reimburse Manager for any expenses which Manager incurred, and all other reasonable expenses incurred by Manager in connection with the exercise of its duties under this Agreement, it being understood that all reasonable charges for travel, lodging, meals and other such expenses related to the performance of Manager's duties hereunder are to be included in Bank's costs and are not to be borne by Manager. Notwithstanding the foregoing, Manager will not charge Bank for Mr. Yancey's travel between Florida and Alexandria, nor his lodging in Alexandria.

4.03 <u>Payments.</u> All professional fees, reimbursements, and asset administration fees shall be paid to Manager monthly, within 30 days of the invoice presented to Bank thereof.

4.04 <u>Disposition Fees.</u>

(Intentionally deleted).

**ARTICLE V**
**GENERAL**

5.01 <u>Insurance.</u> Manager shall, at Bank's expense, obtain adequate insurance for the Property, of such types and amounts of insurance coverage as are customarily: (A) maintained by owners or operators of properties similarly situated to the Property; or (B) required by institutional lenders in like transactions. Manager shall name Bank as an additional insured on all liability policies of insurance Manager may obtain in connection with the performance of Manager's duties as Receiver and Manager shall name Bank as lender loss payee on all property policies of insurance Manager may obtain with respect to the Property.

5.02 <u>Indemnification.</u> Bank shall indemnify Manager and its officers, directors, agents and associates and defend and save it and them harmless from and against all claims, losses and liabilities (except for those caused by Manager's breach of its standard of care pursuant to Section 5.05 below) (i) arising out of or in connection with the services rendered by Manager pursuant hereto, (ii) in any way otherwise arising out of or occasioned by or in connection with the acts or omissions of Bank or its respective partners, officers, directors, agents or employees, (iii) arising from any breach of Bank's obligations under this Agreement, and (iv) all costs, fees and attorneys' expenses in connection with all the foregoing.

5.03 <u>Limitation of Liability.</u> In no event, whether as a result of breach of contract, strict liability or otherwise, and whether arising before or after completion of this Agreement, shall Manager be liable to Bank for any direct, indirect, special, incidental or consequential damages of any nature whatsoever or for any damages caused by or related to unavailability of the Property or any portion thereof, facility shutdowns or service interruptions (including but not limited to, loss of profits, sales, utility services, revenues, inventory or use charges, interest expense, loss of

financing, cost of capital or claims of tenants or persons claiming through them), except to the extent caused by Manager's violation of its standard of care pursuant to Section 5.05 of this Agreement.

5.04 <u>Survival.</u> This Article V shall survive the completion of services or the termination of this Agreement for any reason whatsoever, and shall bind all parties hereto.

5.05 <u>Standard of Care.</u> In the performance of its duties hereunder, it shall be Manager's obligation for the term of this Agreement to perform its duties in good faith and without willful misfeasance, reckless disregard of duty or gross negligence; and Manager shall not be liable to Bank for any errors or omissions committed in the discharge of its duties hereunder, unless such errors or omissions constitute gross mismanagement, gross neglect, willful misconduct, intentional disregard or breach of the express terms of this Agreement. Manager shall devote such time as is reasonably necessary to perform its duties under this Agreement. Bank acknowledges, however, that Manager shall have the right to conduct any other business or activity whatsoever, including the performance of similar services for other properties and for other persons or entities, provided such actions do not compete with the business of the Property, and Bank hereby expressly consents to, and waives any claim for damages or otherwise with respect to, such other business or activity by Manager.

5.06 <u>Unenforceability.</u> If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

5.07 <u>Notices.</u> Any notice expressly provided for in this Agreement shall be deemed sufficiently given when received by the party to be notified at its address set forth below, or when mailed, if mailed by registered or certified mail, postage prepaid, addressed to such party at such address. Any party and any representative designated below may, by notice to the others in the manner provided for herein, change its address for receiving such notices. All compensation and reimbursement to Manager herein shall be paid to it at its address for receiving such notices. All notices and other communications on behalf of Manager shall be signed by a duly authorized officer or Manager, and all notices and other communications on behalf of Bank shall be signed by the party designated in Section 1.03.

Address for notices to Bank:

Jack J. Kane
Managing Director
BMO Capital Markets/Harris N.A.
115 S. LaSalle Street; 12 West
Chicago, Il 60603
Tel:(312) 461-7900

Cell:(312) 339-4848
Fax:(312) 461-7958
Jack.kane@bmo.com

Address for notices to Manager:

R.A. Yancey & Associates, Inc.
1412 Colville Court
St. Augustine, FL 32095-8440
Cell: 804-690-1807
ray@rayancey.com
or, in the case of notices or communications to either party, at such other address as it
shall have designated by written notice to the other.

5.08 Successors. This Agreement shall be binding upon and shall inure to the benefit of
the parties and their respective successors and assigns, but may not be assigned by either Party,
by operation of law or otherwise, in whole or in part, without the written consent of the other
party. Any purported assignment without consent shall be voidable at the option of the non-
assigning party.

5.09 Entire Agreement. This Agreement constitutes the entire agreement between the
parties hereto with respect to the subject matter hereof and may not be changed or modified
orally, but only by an instrument in writing signed by the parties, which states that it is an
amendment to this Agreement. Headings shall have no effect on the interpretation of this
Agreement.

5.10 Attorney's Fees. In the event either party elects to enforce any rights or obligations
arising out of or resulting from this Agreement, whether in law or equity or whether or not
proceeding to final judgment, the prevailing party shall be entitled, in addition to any other rights
or remedies available to it, to collect from the non-prevailing party or parties the reasonable costs
and expenses incurred in the investigation preceding such action and the prosecution of such
action, including but not limited to reasonable attorney fees and court costs.

5.11 Confidential Information. The Gramm-Leach-Bliley Act of 1999 requires, in part,
that when the Bank or its counsel shares non-public personal information about Bank's customers
with companies like the Manager, there needs to be a written agreement covering the
confidentiality and security of such non-public personal information. Set forth below are the
Manager's responsibilities if it receives or observes personally identifiable financial information
about Bank's customers, including any list, description, or other grouping of Bank's customers
that is derived using any personally identifiable financial information that is not publicly
available including the fact that any such customer is a customer of Bank ("Non-Public Personal
Information"). Manager will not disclose Non-Public Personal Information to any third party

unless such disclosure is permitted by applicable law or is in response to requests from any governmental or regulatory agency. Manager will use the Non-Public Personal Information only to perform its obligations under this engagement letter. Manager will safeguard any Non-Public Personal Information in your possession against unauthorized destruction, loss, alteration or access. Upon reasonable prior notice, Bank may request information about the measures Manager employs to safeguard such Non-Public Personal Information. Manager will promptly notify Bank of any unauthorized disclosure, loss, alteration or access to Non-Public Personal Information and will take appropriate actions to mitigate the risk or damage arising from such unauthorized disclosure, loss, alteration or access.

     5.12 <u>Applicable Law.</u> This Agreement shall be construed, performed and enforced in accordance with the laws of the Commonwealth of Virginia.

     5.13 <u>Counterparts: Electronic Signatures.</u> This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same instrument. Signatures transmitted by facsimile machine or signatures transmitted via e-mail in a "PDF" format may be used in place of original signatures. Each party intends to be bound by such party's facsimile or "PDF" format signature on this Agreement, is aware that the other parties are relying on such party's facsimile or "PDF" format signature, and hereby waives any defenses to the enforcement of this Agreement based upon the form of signature.

<b>[SIGNATURES APPEAR ON THE NEXT PAGE]</b>

**IN WITNESS WHEREOF,** Manager, Bank and Bank have caused this Agreement to be duly executed, as of the date and year first above written.

**MANAGER:**                                                    **BANK:**

R.A. YANCEY & ASSOCIATES, INC.                    BMO HARRIS BANK N.A.

By: _____                         By: _____

Name: _____                         Name: Jack J. Kane

Title: _____                         Title: Managing Director

## EXHIBIT A

### List of Entities

THE TRULAND GROUP, INC.
TRULAND SYSTEMS CORPORATION
PEL-BERN ELECTRIC CORPORATION
BLUMENTHAL KAHN
TRULAND ELECTRIC, LLC
TECH, INC.
THE TRULAND GROUP
OF COMPANIES, CORP.
SNOWDEN RIVER CORPORATION
TRULAND SERVICE CORPORATION
TRULAND WALKER SEAL
TRANSPORTATION, INC.
NORTHSIDE TRULAND
ELECTRIC, LLC

———————————————

## Exhibit B

## Description of Property

     (a)    Accounts (including Health-Care-Insurance Receivables, if any);

     (b)    Chattel Paper;

     (c)    Instruments (including Promissory Notes to the extent properly perfected);

     (d)    Documents (subject to the Stipulation and Consent Order Regarding Cash Collateral and Abandonment Motions entered in Borrower's bankruptcy cases);

     (e)    General Intangibles (including Payment Intangibles and Software, Patents, trademarks, tradestyles, unregistered copyrights, and all other intellectual property rights, including all applications, registration, and licenses therefor, and all goodwill of the business connected therewith or represented thereby);

     (f)    Letter-of-Credit Rights to the extent perfected by a duly authorized control agreement;

     (g)    Supporting Obligations;

     (h)    Deposit Accounts to the extent perfected by a duly authorized deposit control agreement or subject to setoff or recoupment rights of Bank;

     (i)    Investment Property (including certificated and uncertificated Securities, Securities Accounts,  Security Entitlements, Commodity Accounts, and Commodity Contracts);

     (j)    Inventory;

     (k)    Equipment (including all owned software, whether or not the same constitutes embedded software, used in the operation thereof);

     (l)    Fixtures;

     (m)    Commercial Tort Claims related to the Utah Data Center;[1]

     (n)    Rights to merchandise and other Goods (including rights to returned or repossessed Goods and rights of stoppage in transit but excluding any automobiles or other goods covered by a certificate of title issued by a motor vehicle department) which is represented by, arises from, or relates to any of the foregoing;

     (o)    Monies, personal property, and interests in personal property of Borrower of any kind or description now held by Bank or at any time hereafter transferred or delivered to, or coming into the possession, custody, or control of, Bank, or any agent or affiliate of Bank, whether expressly as collateral security or for any other purpose (whether for safekeeping, custody, collection or otherwise), and all dividends and distributions on or other rights in connection with any such property;

     (p)    Supporting evidence and documents relating to any of the above-described property, including, without limitation, computer programs, disks, tapes and related electronic data processing media, and all rights of Borrower to retrieve the same from third parties, written applications, credit information, account cards, payment records, correspondence, delivery and installation certificates, invoice copies, delivery receipts, notes, and other evidences of indebtedness, insurance certificates and the like, together

---

[1] All of Borrower's right, title and interest in and to any and all tort claims arising out of, or related to, Borrower's work at the Utah Data Center, also known as the Intelligence Community Comprehensive National Cybersecurity Initiative Data Center in Bluffdale, Utah, including, without limitation, any tort claims against Balfour Beatty/DPR/Big-D, a Joint Venture, Ludvik Electric Co., Siemens Corporation, Codale Electric Supply, Inc., and Nedco Supply, but not including any claim against any of Borrower's officers, directors, agents or employees.

with all books of account, ledgers, and cabinets in which the same are reflected or maintained (collectively, the "Data") (subject to the Stipulation and Consent Order Regarding Cash Collateral and Abandonment Motions entered in Borrower's bankruptcy cases);

       (q)    Accessions and additions to, and substitutions and replacements of, any and all of the foregoing; and

       (r)    Proceeds and products of the foregoing, and all insurance of the foregoing and proceeds thereof.

Excluded Property

1. Borrower's motor vehicles and other goods covered by a certificate of title issued by a motor vehicle department, any commercial tort claims other than those expressly provided for herein, any deposit accounts in which Bank does not hold a duly authorized deposit control agreement or rights of setoff or recoupment.

2. Any of Borrower's insurance policies covering motor vehicles and other goods covered by a certificate of title issued by a motor vehicle department, management liability (including directors & officers, fiduciary liability and commercial crime), lead umbrella and excess umbrella.

## EXHIBIT C
## General Responsibilities of Manager

1.  Develop appropriate plans to monetize, on an accelerated timeframe, the Truland assets abandoned to the Receiver by the Chapter 7 Trustee (review same with Bank).

2.  Retain (with the Bank's concurrence) and manage necessary outside professionals and Truland support personnel to implement the accelerated asset recovery work plans.

3.  Locate and secure all necessary files and records associated with non-bonded projects and Service contracts in order to facilitate the timely assessment and completion of Truland's scope of work, collection of receivables, and settlement of project liabilities, as and if required.

4.  Supervise the organization and assembly of the tangible personal property (including tools, equipment, furniture, fixtures, office equipment, and construction materials and inventories in all office and shop/warehouse locations), obtain estimates of value, and solicit bulk bids and conduct auctions, as appropriate to maximize net receipts. Make recommendations to Bank regarding same.

5.  Communicate and negotiate with landlords to minimize rent liability consistent with asset liquidations and preservation of records. Make recommendations to Bank regarding same.

6.  Engage (with Bank's concurrence) special construction counsel, if necessary, to file mechanic's liens, bond claims and the like in order to facilitate collection of receivables.

7.  To the extent adequate data is available in the Truland business records, direct the preparation and submission of Truland invoices covering the completed but unbilled contact work through July 20, 2014 associated with the company's non-bonded projects (with an initial focus on the substantially completed projects). Develop and implement plan for billing Service contract work currently unbilled and make recommendations to Bank regarding same. Develop and implement plan to collect outstanding Service invoices and make recommendations to Bank regarding same.

8.  Direct necessary actions for the collection of accounts receivable and retention receivable on Truland projects identified as 100% complete on the June Contract Status Report.

9.  Direct collection activities associated with all other non-bonded Truland project receivables and selected bonded project receivables where there is an agreement with applicable surety to do so and where such activities are economically justified.

10. Undertake analysis to determine the advisability of completing Truland's unfinished scope of work on non-bonded project identified as substantially complete. Where appropriate, engage with general contractors and electrical subcontractors to bring resolutions that maximize net receipts (make recommendations to Bank regarding same). Assess the feasibility and advisability of completing work on non-bonded projects that were

identified as less than 90% complete as of the end of June 2014. Make recommendations to Bank regarding same.

11. Analyze Utah project, interview incumbent counsel (including litigation and insurance coverage counsel) and provide recommendations regarding continued retention of same. Assist in locating replacement counsel if incumbents are determined not to be retained. Promptly engage in business level (non-legal) discussions with decision makers at BDB (general contractor), Cache Valley Electric and Ludvik Electric to implement a business resolution to the construction disputes and outstanding payable issues that accelerate the timing of receipt of cash, and mitigate further litigation expense. Similarly engage in business level (non-legal) discussions with decision makers at Zurich regarding possible resolution of insurance coverage issues.

12. Develop and maintain appropriate accounting records; prepare roll-forward of the June 30th Accounts Receivable and Accounts Payable balances for all non-bonded projects with an initial focus on the substantially completed projects and all Service contracts.

13. Assess current insurance coverage and determine adequacy of same; provide observations and recommendation to Bank.

14. Immediately identify the financial records necessary to reconcile Truland's cash balances and promptly after receiving a complete set of the necessary financial records, prepare a reconciliation of Truland's cash balances from July 20 through August 31, 2014 detailing key sources and uses of cash; identify beginning cash balance and net cash generated during the same period for the account of BMO/Harris Bank, sureties, and Chapter 7 Trustee.

15. Beginning with September 12, 2014 provide weekly reports on Fridays, for the Friday to Thursday week prior, to the Bank summarizing key sources and uses of cash for the week ended and on a cumulative basis. Provide detail supporting schedules as requested. The first report will be due on September 19, 2014. The weekly report will outline work activities during the week and values realized from the following key asset recovery sources:
    - Project Receivable Collections
    - Service Receivable Collections
    - Liquidation of Tangible Personal Property
    - Notes Receivables/Other Assets
    - Utah Data Center Project Receivables/Change Orders/Claims

16. Approve all trade payables and vendor invoices incurred by Receiver. Provided that there are available funds in the accounts to be established by the Receiver, the Receiver shall promptly remit payment on all such payables and invoices and shall account to Bank for the same on a monthly basis.

17. Such other financial advisory services as required by Bank or the Court.

18.  File such operating reports with the Court as required by the Court.



## EXHIBIT D

### Schedule of Professional Fees (hourly)

Principal(Ray)                          $315.00
Senior Associate(Dave)                  $250.00
Senior Associate(Scott )                $185.00
Associate(Dan)                          $150.00
Junior Associates(Josh & John)          $125.00
Other Professionals    TBD, as approved by Bank

(Subject to change per Section 4.01)


Independent Contractors:

Ed Kochis                               $150.00
Accounting Consultant
Former Truland Manager

Phillip Bowman                          $150.00
Construction MGMT Consultant

Veronica Laney                          $ 85.00
Billing

George Suckols                          $ 65.00
Navah Gottesman                         $ 65.00
Data Input