IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| BMO Harris Bank, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:14CV1187 (JCC/JFA) |
| | ) | |
| TRULAND SYSTEMS CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Receiver Raymond A. Yancey's (the "Receiver") Emergency Motion for Direction and Enforcement of Receiver Order. [Dkt. 82.] For the following reasons, the Court will hold that, pursuant to the terms of the Receivership Order, the Receiver can use the Receivership Property to fund the Arbitration, without BMO interference. The Court will also hold that the Receiver can refuse, based upon his sound business judgment, to provide an interim distribution in the amount of $1.8 million to BMO.

**I.   Background**

On July 23, 2014, Truland filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Eastern District of Virginia. The Bankruptcy Court subsequently appointed a Chapter 7 Trustee. On September 4, 2014, the Bankruptcy Court issued a

1

Consent Order Granting Emergency Motion for Relief from Stay ("Stay Lift Order"), which had been filed by BMO Harris Bank, N.A. ("BMO"). This Order permitted BMO to take charge of certain property (the "Collateral") and to seek the appointment of a receiver.

On September 9, 2014, pursuant to BMO's request, this Court entered a Receivership Order. [Dkt. 9.] The Receivership Order appointed Raymond A. Yancey to take charge of all Receivership Property, which consisted of the Collateral as defined by the Bankruptcy Court's Stay Lift Order. [*Id.*] That same day, the Receiver, on behalf of R.A. Yancey & Associates, Inc., entered into a Management Agreement with BMO. Mem. in Supp., ¶ 6; *see also* Management Agreement, Exh. B. The Management Agreement provided that, in the event of any conflict between any of its provisions and a court order, "the latter shall govern." Management Agreement, ¶ 1.02. Among other things, the Management Agreement provided a mechanism whereby BMO would pay for certain expenditures of the Receiver on behalf of the Receivership Estate, including but not limited to legal fees and expenses.[1] *Id.*, ¶ 2.07.

Prior to the commencement of these proceedings, in December 2013, an arbitration demand was filed by Balfour

---

[1] The Receivership Estate has paid all of its own expenses to date, including legal and professional fees. Mem. in Supp., ¶ 12.

Beatty/DPR/Big-D, a Joint Venture ("BDB"), against Truland, among other entities, as a result of Truland's allegedly faulty installation of electrical equipment at a project known as the Utah Data Center (the "Project"). In response to BDB's claims against it, Truland filed an arbitration demand against Cache Valley Electric Company ("Cache Valley") for contribution and/or indemnification, among other claims. The two arbitrations were then consolidated. Arbitration is scheduled to proceed for seven weeks, beginning June 26, 2017. Mem. in Supp. [Dkt. 83], ¶ 15. Given the length and complexity of the issues involved in Arbitration, the Receiver anticipates that the Receivership Estate's future legal fees will be substantial. *Id.*, ¶ 15.

Recently, BMO informed the Receiver that it was concerned that it could be obligated to provide funding to the Receivership Estate, pursuant to the terms of the Management Agreement, if Arbitration is unsuccessful. Mem. in Supp., ¶ 18; *see also* Management Agreement, ¶ 4.02. BMO has taken the position that the Receiver cannot use the cash collateral in the Receivership Property without its consent, and that it does not consent to the use of that collateral to fund the Arbitration. Mem. in Supp., Exh. C at 1. BMO has also requested that the Receiver make an interim distribution to BMO in the amount of $1.8 million, which Receiver asserts would go against his sound business judgment, given the pending Arbitration. Mem. in Supp.,

¶ 21; Exh. C. at 2-4.  As the result of these disagreements, BMO exercised its option to terminate the Management Agreement.  On June 30, 2017, the Management Agreement between the Receiver and BMO will end.  Mem. in Supp., ¶ 22.  After this date, both parties agree that, other than the provisions in the Management Agreement that survive termination (¶ 3.05), their only remaining obligations to each other can be found in this Court's Receivership Order.[2]  *Id.*, ¶ 23.

On June 23, 2017, the Receiver filed an Emergency Motion for Direction and Enforcement of Receiver Order.  [Dkt. 82.]  BMO filed its memorandum in opposition on June 28, 2017.  [Dkt. 90.]  The Receiver replied that same day.  [Dkt. 95.]  Oral argument was held on June 29, 2017.  This motion is now ripe for disposition.

## II. Analysis

In order to resolve the present dispute between the parties, the Receiver has requested further direction from this Court regarding the enforceability of the Receivership Order as it relates to two issues: (1) the ability of the Receiver to use Receivership Property to fund the pending Arbitration, without interference from BMO; and (2) the ability of the Receiver to use

---

[2] In its brief in opposition, BMO devotes significant time to a possible breach of contract claim involving its Management Agreement with the Receiver.  Opp. [Dkt. 90] at 10-14.  Because the Receiver's emergency motion asked for clarification regarding this Court's Receivership Order only, that claim is not properly before the Court.  Accordingly, the Court declines to decide the issue today.  The Court likewise declines to order the Receiver to distribute $1.8 million to BMO, pursuant to the Management Agreement's terms.

4

his independent business judgment to refuse to provide any interim distributions to BMO at this time. Mem. in Supp. at 13. The Receiver alleges that, without this Court's intervention, his dispute with BMO threatens to interfere with his ability to fulfill his obligations under the Receivership Order. *Id.* at 12.

As noted by the Receiver, he has, at a minimum, all of the powers and duties set forth in the Receivership Order. *See, e.g., Liberte Capital Grp., LLC v. Capwill*, 99 F. App'x 627, 633 (6th Cir. 2004) ("A receiver has the powers and duties directly stated within a court's order. He also has any implied powers clearly and reasonably necessary to meet his duties."); *First United Bank & Trust v. Square at Falling Run*, 2011 WL 1563108, at *8 (E.D. W. Va. Mar. 31, 2011) (citations omitted) ("As an officer of the court, the receiver's powers are coextensive with his order of appointment."). Thus, the Court will begin its analysis with a discussion of the various powers and duties set forth in its Receivership Order.

First, the Receivership Order provides broad discretionary powers to the Receiver to "preserve, operate, manage and maximize the value of the Receivership Property." Receivership Order [Dkt. 9], ¶ 1. For example, as relevant here, Paragraph 4 of the Receivership Order vests the Receiver with "*full power in his discretion* to employ and discharge and to compensate such attorneys, accountants, appraisers, auctioneers,

5

managers and employees as he may deem appropriate." *Id.*, ¶ 4 (emphasis added). In addition, Paragraph 7 of the Order specifically provides that:

> [T]he Receiver is hereby *fully authorized and empowered* to institute and prosecute all such claims, actions, suits, insurance matters and the like (except with respect to those claims [not relevant here]) as may be necessary in his judgment for the proper protection of the Receivership Property, and likewise, to defend all claims, actions or suits as may be or may have been instituted against the Receivership Property or against him as Receiver of the Receivership Property, and to settle any of the said claims, actions, lawsuits, insurance matters and the like.

*Id.*, ¶ 7 (emphasis added). Other than his discretion, nothing in these provisions, or any other provisions contained in the Receivership Order, qualifies these broad powers. There is no language in the Receivership Order to suggest, for example, that the Receiver must first seek BMO's consent before discharging his duties. Rather, the Receivership Order makes clear that the Receiver has the power to defend Truland, including in actions such as the pending Arbitration, and to employ and compensate "such attorneys . . . as he may deem appropriate" in order to effectively do so. *Id.*, ¶¶ 4, 7.

Second, the Receivership Order places great emphasis on the Receiver's ability to operate independently, so that he can pursue the best interests of the Receivership Property. For example, the Receivership Order states that the Receiver should exercise "his own . . . sound business judgment" and prevents

6

Truland's creditors—a group that necessarily includes BMO—from "interfering in any way with the possession, management or control of any part of the Receivership Property, or from interfering in any way to prevent the discharge of [the Receiver's] duties." Receivership Order, ¶¶ 1, 3.  The Receivership Order also provides for the Receivership to be self-sustaining, stating that "the Receivership is to be conducted solely from the funds arising from the Receivership Estate."  *Id.*, ¶ 7.  Again, this language is broad and unqualified.  It explicitly prohibits BMO from dictating how the Receiver carries out his duties, *id.*, ¶ 3, including his decision to defend Truland in the pending Arbitration, *id.*, ¶ 7. Furthermore, the cash collateral that the Receiver currently has on hand arose from the Receivership Estate.  By the express terms of the Receivership Order, then, he is permitted to use those funds to discharge his duties.  There is nothing in the Receivership Order to suggest otherwise.

Third, the Receivership Order is replete with examples of language that instruct the Receiver to use "his own independent sound business judgment" when carrying out his duties. Receivership Order, ¶ 1.  For example, as noted above, the Receivership Order provides the Receiver with "full power in his discretion" to hire, fire, and pay various professionals whose work will help to preserve the Receivership Property.  *Id.*, ¶ 4. The Receiver also has the power to retain prior employees of the

7

Defendants "as he deems appropriate *in his judgment*." *Id.*, ¶ 5 (emphasis added). In addition, the Receivership Order directs him to "continue, conduct, manage and operate the Receivership Property . . . in such manner as will, *in his judgment*, best preserve the Receivership Property," including, *inter alia*, the power to make and perform contracts; purchase and sell merchandise, material, supplies, and equipment; and market and sell the Receivership Property itself, "if the Receiver deems such sale to be advantageous or prudent." *Id.*, ¶ 7 (emphasis added). Furthermore, the Receivership Order specifically points out that the Receiver will not be held liable for actions taken or decisions made that are based upon "the exercise of reasonably prudent business judgment." *Id.* Taken together, this language demonstrates that the Receiver is entitled to rely upon his own sound decision-making skills.

Although BMO acknowledges that the Receivership Order provides the Receiver with "broad discretionary authority," BMO nevertheless maintains that its consent is required before the Receiver may use its cash collateral. Opp. at 3-10. In support of this argument, BMO points out that the Receivership Order "is silent as to the use of cash," other than to acknowledge that the Receivership should be conducted solely with funds arising from the Receivership Estate. *Id.* at 4. The Court agrees with BMO's analysis so far. BMO then goes on to argue that the Receivership

Order's failure to address the use of cash collateral—and BMO's consent to that use—is by design. *Id.* The parties' negotiations, according to BMO, led to the decision to negotiate a Management Agreement, which "clearly set[s] forth the terms and conditions on which the Bank would consent to the Receiver's use of [cash collateral.]" *Id.* At its essence, then, BMO's argument is that this Court should interpret and enforce the terms of the Management Agreement. But that Agreement is not properly before the Court.[3] The Receivership Order is. That Order's broad language makes clear, as explained at length above, that the Receiver has the power to use the Receivership Estate's funds to carry out his duties. Those funds necessarily include BMO's cash collateral. No consent is required.

In addition, even absent an agreement or order, BMO still contends that its consent should be required. Opp. at 6-10. BMO argues that its first priority security interest in the Receivership Property is a property right protected by the Fifth Amendment. *Id.* at 6-7. Drawing analogies to bankruptcy law, BMO contends that this type of property right must be protected by its consent, a bankruptcy court determination that authorizes the specific transaction, or a cash collateral order negotiated by the parties. *Id.* BMO has not cited, and the Court has been unable to

---

[3] The instant emergency motion seeks clarification on the Receiver's powers and duties under the Receivership Order only. That Order does not mention or incorporate in any way the Management Agreement's terms.

locate, any cases that stand for the proposition that these principals should be imported into the receivership context. Moreover, BMO has already negotiated a private agreement with the Receiver regarding how to obtain its consent for the use of cash collateral. Now that BMO has exercised its option to terminate that agreement, the parties are left with the language of the Receivership Order only. As noted above, however, that Order simply does not require BMO's consent.

Accordingly, the Court finds that the terms of the Receivership Order bestow broad, discretionary powers on the Receiver to use "his own . . . sound business judgment" to "maximize the value of the Receivership Property." Receivership Order, ¶ 1. He is well within his powers and duties under the Order to continue with the pending Arbitration.[4] He is likewise within his powers and duties to use Receivership Property to fund that Arbitration. Finally, the Receivership Order permits the Receiver to conclude, as he apparently has, that he should decline BMO's request to pay it $1.8 million as an interim distribution.

---

[4] The Receiver expresses concern in a footnote about whether it would be in his best interests to seek a discharge of his duties under the Receivership Order. The Receiver appears worried that, as of June 30, 2017, BMO will no longer be obligated to pay for any of the Receivership Estate's expenses, should Arbitration go poorly. Based on this limited information, the Court is in no position to advise the Receiver regarding his next steps. Rather, it can only remind the Receiver of the terms of the Receivership Order itself, which protect the Receiver from personal liability, so long as his actions or decisions are based upon "the exercise of reasonably prudent business judgment." Receivership Order, ¶ 7.

## IV. Conclusion

For the reasons set forth above, the Court will hold that, pursuant to the terms of the Receivership Order, the Receiver can use the Receivership Property to fund the Arbitration, without BMO interference.  The Court will also hold that the Receiver can refuse, based upon his sound business judgment, to provide an interim distribution to BMO.

An appropriate order will follow.


|  | /s/ |
|---|---|
| July 5, 2017 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |